UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:09-00204 |
| | ) | Judge Echols |
| ELLIOT COLUMBUS MEDLIN | ) | |
| | ) | |

**MEMORANDUM**

Defendant Elliot Medlin filed a Motion to Suppress (Docket Entry No. 19), to which the Government filed a response in opposition (Docket Entry No. 29).

Defendant seeks to suppress all evidence seized during the search of 114 Westlawn Drive, Nashville, Davidson County, Tennessee, on January 20, 2009, on the ground that the search warrant issued by a state General Sessions Court Judge was predicated on an affidavit that did not establish probable cause for the search. Defendant also seeks to suppress any and all statements, recordings, and/or transcripts of statements purportedly made by him on the ground that they were collected in violation of his right to counsel, his right to remain silent, and the marital communications privilege. The Court held a suppression hearing on Thursday, February 25, 2010.

**I. FACTS**

With regard to the first issue–whether the search warrant was supported by probable cause–the Government did not present any witnesses at the evidentiary hearing. Rather, the Government relied on a copy of the search warrant affidavit which was attached as an exhibit to the Government's response to the motion to suppress. (Docket Entry No. 29-1.) The content of the affidavit will be discussed below.

With regard to the second issue–whether Defendant's statements should be suppressed–the Government called one witness, Michelle Ray, to introduce audio recordings of telephone calls made by the Defendant while he was detained at the local jail. Ray is an investigator with the Davidson County Sheriff's Office and she is the point-of-contact for inmate telephone calls. She brought with her to the hearing certain records from the jail's management system, which is a computerized

1

database used to keep track of inmates.  According to Ray, these records are considered to be Sheriff's Office business records.  If a member of the public or media requests the records, they are provided.  Thus, the records are open to inspection by any one, including law enforcement.

Each inmate who enters the jail is assigned an "OCA," a unique numerical identifier based on fingerprints.  The OCA is assigned when the inmate is first booked into the jail.  Defendant was assigned an OCA of 79368 when he was booked on January 20, 2009.  (Gov't Ex. 1 at 1.)  The records show Defendant was housed first in the booking area and then he was transferred to 1A, sometimes referred to as the gym, at 4:42 a.m. on January 21, 2009.  When Defendant was moved from the booking area to 1A, he changed from civilian clothing to jail clothing and he received a copy of the inmate handbook.  (Gov't Ex. 2.)  The inmate handbook contained a section entitled "**Phone Calls**:"

> There are collect phones in each housing area.  To use them, you will have to set up an account with the phone company.  Calls are NOT private; they are recorded.  Staff may listen to calls with anyone but your lawyer.  The recordings may be turned over to the police if they show evidence of criminal activity.

(Id. at 2.)  Defendant was later housed in 3A.

In the housing areas inmates are required to use a pin number to initiate a call.  The pin is based on the OCA number with enough leading zeros to create a seven-digit number.  In other areas of the jail, a pin number is not required and the inmate may pick up a phone and dial a number.  A pin number is not required to use a phone in the booking area or in 1A.

When an inmate initiates a call from the jail, the call begins with an automated tag to notify the inmate that the phone call is being recorded.  The recording asks for the inmate's information and then plays a tag line which includes a pre-recording made by the inmate, usually stating his name, for the person on the other end of the call so the receiving person will know who the call is from.  The recorded preamble to the phone call tells both the inmate and the receiving person that the telephone call is being recorded or monitored.  This happens each time the inmate places a call.

Ray provided the Government with two sets of records.  The first set showed calls made using the pin number assigned to Defendant.  From that set the Government determined calls were
2

Case 3:09-cr-00204   Document 39   Filed 03/01/10   Page 2 of 10 PageID #: 76

database used to keep track of inmates.  According to Ray, these records are considered to be Sheriff's Office business records.  If a member of the public or media requests the records, they are provided.  Thus, the records are open to inspection by any one, including law enforcement.

Each inmate who enters the jail is assigned an "OCA," a unique numerical identifier based on fingerprints.  The OCA is assigned when the inmate is first booked into the jail.  Defendant was assigned an OCA of 79368 when he was booked on January 20, 2009.  (Gov't Ex. 1 at 1.)  The records show Defendant was housed first in the booking area and then he was transferred to 1A, sometimes referred to as the gym, at 4:42 a.m. on January 21, 2009.  When Defendant was moved from the booking area to 1A, he changed from civilian clothing to jail clothing and he received a copy of the inmate handbook.  (Gov't Ex. 2.)  The inmate handbook contained a section entitled "**Phone Calls**:"

> There are collect phones in each housing area.  To use them, you will have to set up an account with the phone company.  Calls are NOT private; they are recorded.  Staff may listen to calls with anyone but your lawyer.  The recordings may be turned over to the police if they show evidence of criminal activity.

(Id. at 2.)  Defendant was later housed in 3A.

In the housing areas inmates are required to use a pin number to initiate a call.  The pin is based on the OCA number with enough leading zeros to create a seven-digit number.  In other areas of the jail, a pin number is not required and the inmate may pick up a phone and dial a number.  A pin number is not required to use a phone in the booking area or in 1A.

When an inmate initiates a call from the jail, the call begins with an automated tag to notify the inmate that the phone call is being recorded.  The recording asks for the inmate's information and then plays a tag line which includes a pre-recording made by the inmate, usually stating his name, for the person on the other end of the call so the receiving person will know who the call is from.  The recorded preamble to the phone call tells both the inmate and the receiving person that the telephone call is being recorded or monitored.  This happens each time the inmate places a call.

Ray provided the Government with two sets of records.  The first set showed calls made using the pin number assigned to Defendant.  From that set the Government determined calls were

made to a particular telephone number. The Government then requested a second set of records to show all calls from the jail to a specific telephone number even if a pin number was not used to make the calls. In the first set of records, the calls using a pin number assigned to the Defendant were made from the gym area at a time when Defendant was housed there.

Recordings of telephone calls initiated by the Defendant were admitted into evidence on a CD. (Gov't Ex. 3.) Each call included a header line that contained detailed information about the call, including identification of the actual station within the jail from which the phone call was placed and the destination of the call. When played in the courtroom, each call began with a tape-recorded message stating: "This call may be recorded or monitored. I have a collect call from Elliot Medlin an inmate at Davidson County criminal justice center. To accept dial zero and hold. To refuse, dial 5." It is up to the recipient to accept or reject the collect call.

Inmates can initiate three-way calls by first calling one number and then asking the receiving person to dial another number to connect another third person on the telephone call. The jail system tracks only the direct-dialed calls so that, even though there is a subsequent phone call within a phone call, the system shows only the original number dialed. The only way to identify who is being called on a third-party call is to listen to each call. The third person who is dialed into the call does not hear the tape-recorded message stating that the call is being recorded or monitored.

In this case, however, certain third-party recipients of calls from the Defendant were on actual notice that the calls were being recorded or monitored. This is shown by two of the phone calls on Government Exhibit 3. In a three-way call on January 22, 2009 at about 13:32 hours, approximately five minutes and 40 seconds into the call, the Defendant, identified through his OCA, asks the person he dialed directly about a person named "Tommy." A female voice speaks up and says, "They're probably listening to this conversation." In a call on January 22, 2009 at 11:11 hours, about ten minutes into the call, after it has become a three-way call, a female voice says something like, "Don't do that. This phone is tapped[.]"

Defendant's pin number was used to make calls to a particular phone number while on other occasions calls were made to the same phone number without use of Defendant's pin number. A reasonable inference is that the Defendant made calls to the same phone number from various stations within the jail, some of which required use of his pin number and some of which did not.

Defendant did not present any witnesses. Other than cross-examining the Government's witness, Defendant did not produce any additional evidence in support of his motion to suppress.

## II. ANALYSIS

**A. Whether the affidavit provided probable cause for the search warrant**

To establish probable cause necessary for issuance of a search warrant, the supporting affidavit must set forth "a nexus between the place to be searched and the evidence sought." United States v. Penney, 576 F.3d 297, 311 (6th Cir. 2009) (quoting United States v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004)). The task of the issuing judge "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). The task of this Court is simply to ensure that the state judge had a substantial basis for concluding that probable cause existed. Penney, 576 F.3d at 311. The state judge's discretion should be reversed only if it was arbitrarily exercised; a reviewing court is to accord the judge's determination "great deference." United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) (citing Gates). "[L]ine-by-line scrutiny [of an underlying affidavit is] . . . inappropriate in reviewing [a judge's] decisions." Gates, 462 U.S. at 246 n.14. "[T]he traditional standard for review of an issuing [judge's] probable cause determination has been that so long as the [judge] had a `substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." Id. at 236 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

The Court concludes that the state judge who issued the search warrant in this case had a substantial basis for concluding that a search of 114 Westlawn Dr., Nashville, Davidson County,

4

Tennessee, would uncover evidence of drug trafficking. Detective Steve Parks attested in his affidavit in support of the search warrant:

> Within the last 72 hours your affiant met with a reliable confidential informant (herein after referred to as CI). The CI stated that the CI could purchase a quantity of Oxycontin pills from a subject identified as "Elliott Medlin". After meeting with the CI at a predetermined meeting place, the CI and the CI's vehicle were searched for contraband and money, neither of which was found. The CI was given two hundred eighty dollars in previously photocopied twenty dollar bills, an electronic listening device, and a digital recorder. The said CI was then followed by Detectives of the West Crime Suppression Unit to 114 Westlawn Dr., Nashville, Davidson County, Tennessee, to purchase the quantity of Oxycontin Pills. The CI was observed to enter the front door of the residence and was heard to make contact with Elliot Medlin. Medlin was heard to ask the CI "How many" the CI wanted, referring to the Oxycontin pills. The CI was then observed to exit the door of the residence a short time later and enter the CI's vehicle. The CI was then followed by Detectives directly back to a predetermined meeting location where the CI handed over a cellophane bag containing four eighty milligram Oxycontin Pills. The CI and the CI's vehicle were once again searched for any money or contraband and none were found. The drugs were turned into the MNPD Property and Evidence Section.
>
> Additionally, the CI, under the direction and supervision of myself and other Detectives, and with myself and other Detectives present and observing, has purchased similar quantities of Oxycontin from 114 Westlawn Dr. and Elliot Medlin on four previous occasions within the last 90 days. The CI has also visually identified Elliot Medlin to your affiant through photograph as the person who has sold the Oxycontin pills to the CI.
>
> * * *
>
> Said CI is familiar with said drug, Oxycontin, from past exposure and experience. Your affiant knows said "CI" is reliable from past information received from said "CI" that has proven to be true and correct and has resulted in numerous lawful seizures of narcotics including Oxycontin. Affiant will disclose the "CI's" name to the Judge signing the warrant only. The "CI" wishes to remain anonymous for fear of reprisal.

(Docket Entry No. 29-1, Affidavit at 2.)

Thus, Detective Parks informed the state judge that, within the prior 72 hours, he sent a confidential informant into 114 Westlawn Drive in Nashville to purchase Oxycontin pills being sold illegally. The CI and his vehicle were searched before making the buy, and no drugs or contraband were recovered. The CI entered the residence with money received from Detective Parks, who monitored the drug purchase electronically and heard Medlin ask the CI "how many he wanted." The CI left the residence and immediately returned to a predetermined location to meet Detective

5

Parks and give him the Oxycontin pills he purchased with the money provided to him. The CI identified Medlin in a photograph. The CI was familiar with Oxycontin through past exposure and experience. The CI had completed similar purchases of Oxycontin from Medlin at 114 Westlawn on four previous occasions within the prior 90 days. Detective Parks averred that he knew the CI to be reliable because the CI had provided information in the past that was accurate and resulted in lawful seizures of narcotics, including Oxycontin. Detective Parks was willing to identify the name of the CI to the judge, but no one else to preserve the CI's anonymity.

"[W]here a known person, named to the [judge], to whose reliability an officer attests with some detail, states that he has seen a particular crime and particular evidence, in the recent past, a neutral and detached [judge] may believe that evidence of a crime will be found." Allen, 211 F.3d at 976. Even though in Allen the informant's information was not corroborated, the Sixth Circuit nonetheless found there was probable cause to issue the search warrant. The court explained that to require corroboration of such information would aid lawbreakers and handicap the state. See id.

In the present case, the affidavit contained first-hand information from a reliable confidential informant that was corroborated by a police officer through electronic monitoring of the illicit transaction as it occurred. See United States v. Sonagere, 30 F.3d 51, 53 (6th Cir. 1994)(holding statement that event was observed firsthand entitled informant's tip to greater weight than might otherwise be the case). Thus, the instant facts present a stronger showing of probable cause than in Allen.

This case is also similar to United States v. Pinson, 321 F.3d 558 (6th Cir. 2003), in which the Sixth Circuit affirmed this Court's denial of a motion to suppress evidence for lack of probable cause where a similar search warrant and supporting affidavit were at issue. Id. at 560-565. In that case, the defendant asserted "that the affidavit was a 'bare bones' affidavit, lacking information about the confidential informant and his reliability, lacking information on the 'buy'" conducted by the confidential informant, and "lacking evidence that ongoing drug trafficking was taking place at the residence." Id. at 562-63. Relying on Allen, the Sixth Circuit disposed of the contentions,

6

observing that the attesting officer personally knew the CI, named the CI to the magistrate judge, and characterized the CI as reliable. Id. at 563. The court also pointed out the magistrate knew exactly what type of criminal activity the CI had experienced at the place to be searched because the CI personally had purchased cocaine there, which was corroborated by the attestations of the police officer. Id.

The Sixth Circuit further noted in Pinson that Allen and United States v. Campbell, 256 F.3d 381 (6th Cir. 2001), do not suggest the name or a description of a confidential informant must be included in the search warrant affidavit to establish probable cause. Id. at 564. Also, the affidavit need not name or describe the person who sold the drugs or name the owner of the property. Id.

Defendant Medlin contends that the affidavit failed to make any assertion that the CI had been inside Medlin's apartment, that he had ever seen drugs or other evidence inside Medlin's apartment, or that he had seen any evidence of a crime other than the one that occurred when Medlin allegedly sold him drugs. Without such an assertion, Medlin argues, the affidavit fails to establish the necessary nexus between the place to be searched and evidence sought.

Defendant's statements about the content of the affidavit are inaccurate, as shown by the exact language of the affidavit quoted above. The affidavit stated the CI had made four previous buys at 114 Westlawn from Medlin in the prior 90 days and the CI told Detective Parks he had seen Oxycontin pills at that location and could purchase them there. The CI wore a recording device that captured at least one of the drug buys disclosed in the affidavit and the CI identified Medlin by photograph to Detective Parks.

Based on the totality of the circumstances existing before the state judge, the search warrant was supported by adequate probable cause as set out in Detective Parks' affidavit. See United States v. Martin, 526 F.3d 926, 937-938 (6th Cir. 2008). Defendant's motion to suppress all of the evidence seized pursuant to the search warrant will be denied.

7

**B. Whether Defendant's recorded telephone conversations should be suppressed**

Defendant next contends that his telephone conversations with his wife from jail are protected by the marital communications privilege. The Sixth Circuit has held that there are three prerequisites to the assertion of this privilege: "(1) At the time of communication there must have been a marriage recognized as valid by state law; (2) the privilege applies only to "utterances or expressions intended by one spouse to convey a message to the other," United States v. Lustig, 555 F.2d 737, 748 (9th Cir.), cert. denied, 434 U.S. 926, 98 S.Ct. 408, 54 L.Ed.2d 285 (1977) and 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 795 (1978); and (3) the communication must be made in confidence. See generally 2 Jack B. Weinstein and Margaret A. Berger, Weinstein's Evidence § 505[4] (1992)." United States v. Porter, 986 F.2d 1014, 1018 (6th Cir. 1993). "The burden of establishing the existence of the privilege rests with the person asserting it." In re Grand Jury Investigation No. 83-2-35, 723 F.2d 447, 450 (6th Cir. 1983).

Defendant produced no evidence that there was a marriage recognized as valid by state law. He also failed to show that the communications were made in confidence.

Defendant argued at the conclusion of the evidentiary hearing that the government failed to produce any evidence that the female voice identified on the three-way telephone calls was his wife and that the female knew her conversations with the Defendant were being recorded or monitored. By asserting the privilege, it is the Defendant's burden to show the female was his wife and that he was validly married to her; otherwise, as the Government aptly pointed out, Defendant's claim must fail at the outset.

But even assuming that the female voice heard in the conversations was Defendant's lawful wife, the Government's evidence established that Defendant's jail telephone calls were not made in confidence. To the contrary, all calls were recorded and monitored by jail officials. Defendant was provided with a jail inmate handbook upon his admission to the jail which informed him explicitly that his telephone conversations would not be private and would be subject to monitoring. A unique OCA number was assigned to the Defendant which linked him to certain of the telephone

8

calls. At the beginning of each call the Defendant made, whether by using his pin number or not, he heard a recorded statement telling him that his call was not confidential and that it would be recorded and/or monitored. The same recorded statement was heard by the recipient of the Defendant's calls. Thus, Defendant had no expectation of privacy in those calls and neither did those persons who participated in the calls. See United States v. Hadley, 431 F.3d 484, 489, 509-510 (6th Cir. 2004) (admitting into evidence recording of telephone call made by defendant to wife from jail where inmates were warned calls were recorded, inmates were given an identification number for use in placing collect calls, and calls made using the ID number included a recorded preamble identifying the inmate who originated the call); United States v. Madoch, 149 F.3d 596, 602 (7th Cir. 1998) (jail telephone call between husband and wife not protected by marital communications privilege); United States v. Etkin, 2008 WL 482281 at *3 (S.D.N.Y. Feb. 20, 2008) (email sent from husband to wife on work computer system not protected by marital communications privilege where husband was warned his use of the computer was subject to monitoring).

Even if the female whose voice is heard on the third-party calls did not hear the recorded preamble as the recipient did, the female nevertheless had actual notice the calls were being monitored. On two different occasions she said, "They're probably listening to this conversation," and "Don't do that. This phone is tapped." Because the female knew the calls were being monitored, she had no expectation the calls were made to her in confidence.

Finally, there is no merit to Defendant's general contention that all of his statements should be suppressed as taken in violation of his Fifth Amendment right to remain silent and his Sixth Amendment right to counsel. Defendant was not subject to interrogation by law enforcement officers when he made the statements to the persons he called. See Moran v. Burbine, 475 U.S. 412, 421-422 (1986) ("the record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements. . . Indeed it appears that it was respondent, and not the police, who spontaneously initiated the conversation"). Rather, having been warned that the

9

telephone system used recording equipment and was monitored, Defendant voluntarily, knowingly and intelligently placed calls to persons outside the jail and thereby waived any right to remain silent that he may have had. Withrow v. Williams, 507 U.S. 680, 689-690 (1993). The use of a jail telephone system to make personal calls is also not a "critical stage" of the criminal prosecution to require the assistance of counsel. See Kansas v. Ventris, — U.S. —, 129 S.Ct. 1841, 1844 -1845 (2009). Even if Defendant possessed a Sixth Amendment right to counsel when he made the phone calls, he voluntarily, knowingly and intelligently waived that right. See Montejo v. Louisiana, — U.S. —, 129 S.Ct. 2079, 2085 (2009).

### III. CONCLUSION

For all of the reasons stated, Defendant's Motion to Suppress (Docket Entry No. 19) will be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

10

Case 3:09-cr-00204 Document 39 Filed 03/01/10 Page 10 of 10 PageID #: 84