IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | NO. 3:09-cr-00204 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| | ) | |
| ELLIOT COLUMBUS MEDLIN | ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is "Defendant's Motion for Compassionate Release" (Doc. No. 85, "Motion for Compassionate Release"), filed *pro se* by Defendant Elliott[1] Columbus Medlin and supplemented later in various filings by his subsequently appearing counsel.

Defendant's quest for compassionate release has gone through various stages, which have been reflected in several Memorandum Opinions and Orders (Doc. Nos. 92, 105). Familiarity with such history will be assumed, although the relevant procedural backdrop will be summarized briefly after the Court states (as it has before) the principles governing motions for compassionate release.

### LAW GOVERNING COMPASSIONATE RELEASE MOTIONS

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the Section 603(b)(1) First Step Act of 2018, P.L. 115-391, 132 Stat. 5239,[2] the district court may under certain circumstances grant a

---

[1] For whatever reason, the docket and various filings in this case reflect the spelling of the first name as "Elliot," but Defendant himself spells it with two t's at the end.

[2] That paragraph of Section 603 provides:

(b) INCREASING THE USE AND TRANSPARENCY OF COMPASSIONATE RELEASE.—Section 3582 of title 18, United States Code, is amended—
　　(1) in subsection (c)(1)(A), in the matter preceding clause (i), by inserting after ''Bureau of Prisons,'' the following: ''or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the

defendant's motion for compassionate release[3] if what the Court will call the "exhaustion requirements" have been satisfied—*i.e.*, "[either] the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons [("BOP")] to bring a motion [for compassionate release] on the defendant's behalf or [there has been a] lapse of 30 days since the receipt of such a request [for BOP to file such a motion] by the warden of the defendant's facility, whichever is earlier." Once it properly can act on a motion brought under 18 U.S.C. § 3582(c)(1)(A), the district court can reduce a sentence under that provision (for any defendant younger than 70 years old)[4] only if it finds extraordinary and compelling reasons to do so. *See* 18 U.S.C. § 3582(c)(1)(A)(i). The defendant bears the burden of showing that "extraordinary and compelling reasons" exist to justify release under the statute. *United States v. Hayward*, No. CR 17-20515, 2020 WL 3265358, at *1 (E.D. Mich. June 17, 2020). And the Court does not write on a clean slate in considering what qualifies as "extraordinary and compelling reasons."

Congress tasked the Sentencing Commission with promulgating "general policy statements regarding . . . the appropriate use of . . . the sentence modification provisions set forth in [section] 3582(c) of title 18. . . ." 28 U.S.C. § 994(a)(2)(C). Congress directed the Sentencing Commission,

---
defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . ."

[3] A motion under Section 3582(c)(1)(A) is actually a motion for a reduction in sentence, including but not limited to reductions that would result in the defendant-movant's immediate release. The grant of a motion for sentence *reduction* under Section 3582(c)(1)(A) would not necessarily result in the defendant's immediate *release*. *See United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *8 (D. Utah Feb. 18, 2020) (quoting *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391 at *4 (D. Neb. Nov. 14, 2019)). Nevertheless, such motions generally are known as ones for "compassionate release." *Id.* at n.2 ("In this order, the court uses the phrase 'compassionate release' and 'sentence modification' interchangeably, which is consistent with how other courts have used the terms."); *United States v. McDonald*, No. 94-CR-20256-1, 2020 WL 3166741, at *1 (W.D. Tenn. June 8, 2020). This reflects the fact they typically do seek immediate release rather than a mere reduction in sentence that would result in an earlier release someday but not immediately.

[4] This subparagraph provides an alternative ground for relief for defendants who are at least 70 years of age. *See* 18 U.S.C. § 3582(c)(1)(A). It is inapplicable here, however, because Defendant is only 60.

in promulgating these policy statements, to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In response to these congressional instructions, the Sentencing Commission promulgated U.S.S.G. § 1B1.13, and its application note, which collectively comprise the policy statement(s).

Practitioners of federal criminal law are accustomed to treating the Sentencing Commission's policy statements as advisory only (especially in the aftermath of *United States v. Booker*, 543 U.S. 220 (2005)). They are exactly that in the context of a defendant's original sentencing—but not in the context of a motion under Section 3582(c)(1)(A). In the latter context, they are by statute mandatory, inasmuch as Congress has prohibited courts from granting a sentencing reduction unless "such a reduction is consistent with applicable policy statements issued by" the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A).[5]

Together, U.S.S.G. § 1B1.13 and its application note do two things that are relevant here. First, they define, in Application Note 1, "extraordinary and compelling circumstances" to apply in (and only in) situations falling within one or more of five separate and particular categories, which the Court discusses below. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(i)-(ii), (B), (C) & (D).[6] Second, they prescribe additional requirements for obtaining a sentence reduction where the

---

[5] In *Booker*, the Supreme Court found unconstitutional (*i.e.*, violative of the Sixth Amendment) Congress's directive that the Sentencing Guidelines are generally what was referred to as "mandatory," meaning that sentence generally had to be imposed within the guideline range calculated using the Sentencing Guidelines. To say the least, this limited Congress's ability to make anything about the Sentencing Guidelines mandatory in the context of an original sentencing. But such limitations do not exists in the context of a motion for sentence reduction under Section 3582(c)(1)(A), wherein the Sixth Amendment concerns driving the *Booker* decision are entirely absent.

[6] The Application Note also contains various other instructions for considering whether extraordinary and compelling circumstances exist. Such instructions need not be discussed here, as they do not affect the Court's resolution of the Motion to Reconsider

defendant does meet the threshold requirement of "extraordinary and compelling circumstances."[7] Specifically, for a defendant not yet 70 years old (such as Defendant), the court may reduce a sentence if (1) extraordinary and compelling reasons warrant a reduction, *and* (2) the defendant is not a danger to the safety of any other person or to the community, *and* (3) the reduction is consistent with the policy statement. *See* U.S.S.G. § 1B1.13(1)(A), (2) and (3). The Application Note indicates the third requirement may be redundant of the first two, inasmuch as it states that

---

[7] It is worth noting that these other requirements—being, after all, *requirements*—are mandatory. That is to say, a defendant is *not* eligible for compassionate release merely because there are "extraordinary and compelling reasons" within the meaning of Application Note 1.

As the Court said in its Order granting the Motion for Reconsideration:

[i]It is vital to clarify the use of the terms "eligibility" or "eligible" in this context. The Court perceives that Defendant's current request is that the Court reconsider *only* its prior conclusion that his medical condition (as considered in the context of his incarceration at FCI Seagoville in the midst of the COVID-19 pandemic) does not constitute "extraordinary and compelling reasons" under Application Note 1(A)(ii)(I) for purposes of U.S.S.G. § 1B1.13(1)(A) and 18 U.S.C. § 3582(c)(1)(A)(i). (*See* Doc. No. 109 at 5) (noting that Defendant "asks that the Court state that it would grant Medlin's request for reconsideration and that it would rule he is eligible under Note 1(A)(ii)(I)."). This perception is buttressed by the fact that Defendant's appeal challenges only this conclusion, and not, for example, the Court's alternative conclusion that compassionate release for Defendant would not be warranted even if he could show "extraordinary and compelling reasons." (Doc. No. 105 at 17 n.15). In other words, Defendant asks the Court to state that it would now find that he has satisfied the requirement to show "extraordinary and compelling reasons" because (according to him) his circumstances fall within Application Note 1(A)(ii)(I). But any such finding would not, by itself, make Defendant "eligible" for compassionate release. As discussed above, a defendant is *not* eligible for compassionate release merely because there are "extraordinary and compelling reasons" within the meaning of Application Note 1. For a defendant (like Defendant) who is younger than 70 years old, there are two other requirements for eligibility: that the defendant is not a danger to the safety of any other person or to the community, and the reduction is consistent with the policy statement. *See* U.S.S.G. § 1B1.13(1)(A), (2) and (3). And even though (as discussed above) the latter of these two additional requirements apparently is illusory because it does not truly require anything not otherwise required, the former requirement is very real. That is to say, even if a defendant can show "extraordinary and compelling reasons," the defendant cannot obtain—*i.e.*, is not "eligible"—for compassionate release unless he or she is not a danger to the safety of any other person or the community. Such a defendant is "eligible" for *something*, however: *further consideration of his or her motion for compassionate release*, *i.e.,* an inquiry into whether he or she poses the specified danger and, if not, whether compassionate release is appropriate under the Section 3553(a) factors. When the Court refers to the notion of "eligibility"—including by referring to Defendant's references to his purportedly being "eligible" because he has shown extraordinary and compelling reasons—it does not mean to suggest that a defendant is eligible *for compassionate release* merely because the defendant has shown "extraordinary and compelling reasons."

(Doc. No. 116 at 11-12 n.16).

"any reduction made . . . for the reasons set forth in subdivisions (1) and (2) [*i.e.*, U.S.S.G. § 1B1.13(1) & (2)] is consistent with this policy statement." *Id.* at n.5.[8]

If the court does find these (two or three depending on how one looks at it) requirements satisfied, the defendant has met the basic eligibility for compassionate release. But even then, the Court does not automatically or necessarily grant the motion for a reduction; instead, it *may*, after considering the factors set forth in 18 U.S.C. § 3553(a), reduce the term of imprisonment (and may impose a term of probation or supervised release that does not exceed the unserved portion of the original term of imprisonment). *See* 18 U.S.C. § 3582(c)(1)(A).

As discussed above, the Sentencing Commission has issued a binding policy statement regarding reduction of a term of imprisonment under Section 3582(c)(1)(A). *See* U.S.S.G. § 1B1.13. As further mentioned above, Application Note 1 to U.S.S.G. § 1B1.13 speaks to what constitutes "extraordinary and compelling reasons," identifying five categories of situations where such reasons may be found to exist. Two of the five involve the defendant's medical condition, *i.e.*: (i) the defendant is suffering from a terminal illness, *see* U.S.S.G. § 1B1.13 cmt. n.1(A)(i) ; or (ii) the defendant is suffering from a serious physical or medical condition, *see* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), or serious functional or cognitive impairment, *see* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(II), or deteriorating physical or mental health due to the ageing process, U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(III), that substantially diminishes the defendant's ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover.

---

[8] Like many redundancies, this one may seem odd due to its apparent unnecessariness. But it seems motivated by the valid desire to ensure that the Sentencing Commission's criteria for a sentencing reduction expressly both: (a) included the congressional requirement, discussed below, that any reduction be "consistent with applicable policy statements issued by" the Sentencing Commission; and (b) clarified that the required consistency involved nothing more than satisfaction of U.S.S.G. § 1B1.13(1) & (2).

*See*. The next two categories relate to defendants over 65 and defendants with particular grave family circumstances, respectively; they are not applicable to the instant Motion.

As for the last of the five categories (sometimes referred to as the "catchall" category) the Application Note describes it as encompassing the situation where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D).

## PROCEDURAL BACKGROUND

The Motion for Compassionate Release has already been denied twice, and yet each time it has (appropriately) thereafter been resurrected. It was initially denied without prejudice based on Defendant's failure to satisfy the exhaustion requirements. (Doc. No. 92). Thereafter, through newly appearing counsel, Defendant renewed the Motion for Compassionate Release, asserting that the exhaustion requirements by then had been satisfied and that the Court should grant compassionate release on the merits. (Doc. No. 101).

As for the merits, the Motion for Compassionate Release asserts that Defendant should be granted reduction of his 169-month sentence under 18 U.S.C. § 3582(c)(1)(A) due to the COVID-19 pandemic. Defendant, who was then and still is currently detained at FCI Seagoville in Texas, sought early termination of his prison sentence (currently set to expire on December 10, 2021, according to BOP's searchable online "inmate locator," https://www.bop.gov/inmateloc), and suggested that upon release he be placed on home confinement to live with his wife. He grounded this request on several alleged circumstances related to the pandemic, including: his alleged increased vulnerability to COVID-19 due to his chronic obstructive pulmonary disease (COPD), diabetes and age (60); the alleged enhanced vulnerability to COVID-19 in a prison environment;

and the alleged inability of BOP to prevent or cope with an outbreak of COVID-19 at FCI Seagoville.

On May 1, 2020, the Government filed a response in opposition to the Motion for Compassionate Release. (Doc. No. 103, "Response Opposing Compassionate Release"). Therein, in pertinent part, the Government argued that Defendant had not shown "extraordinary and compelling reasons" within the meaning of any provision within Application Note 1(A)-(C), which of course necessarily would include Application Note 1(A)(ii)(I). (Doc. No. 103 at 8-12). Defendant thereafter replied, suggesting, in pertinent part, that he had shown "extraordinary and compelling reasons" under Application Note 1(A)(ii)(I) in particular. (Doc. No. 104 at 1).

In its May 7, 2020 Order denying the Motion for Compassionate Release, that Court found that Defendant had indeed satisfied the exhaustion requirements. (Doc. No. 105 at 3 n.4). Proceeding to the merits, however, the Court denied the request for compassionate release. The Court did so both: (1) because it sided with the Government in ruling that Defendant had not shown "extraordinary and compelling reasons" under Application Note 1(A)(ii)(I) and, alternatively, (2) because it would be sheer speculation to conclude that Defendant would be less likely to contract COVID-19 if released or that, if he did contract COVID-19, he would fare better if he dealt with the disease outside of BOP custody. (Doc. No. 105).

Defendant thereafter appealed this Order to the Sixth Circuit, raising a single issue: "When denying Elliott Medlin's motion for compassionate release, did the district court err by holding that Note 1(A)(ii)(I) to U.S.S.G. § 1B1.13 does not apply to chronic medical conditions like diabetes and COPD?" (Sixth Circuit Case No. 20-5561, Doc. No. 8 at 6).

In the meantime, it appears that the Government nationwide changed its position regarding the existence of "extraordinary and compelling reasons" in cases like Defendant's. Specifically,

the kinds of conditions that the Government claimed on May 1 were not "extraordinary and compelling reasons" within the meaning of Application Note 1(A)(ii)(I) were conceded soon thereafter by the Justice Department to constitute extraordinary and compelling reasons. The Court discussed this change in an opinion in a different case issued 26 days after its May 7, 2020 Order denying Defendant's Motion for Compassionate Release. *See United States v. Edwards,* No. 3:13-cr-12, Order, Doc. No. 502 at 11-14). In short, it appears that as of May 1, 2020, the Government was taking the position that conditions like chronic asthma and COPD did not (or at least did not necessarily) constitute "extraordinary and compelling reasons" within the meaning of Application Note I(A)(ii)(I). Such position is defensible and arguably persuasive, for the reasons the Court has expressed before in this case. But shortly after May 1, the Justice Department adopted a new and more lenient (towards defendants) standardized view. And consistent with that view, while continuing to maintain that Defendant should not be released, the Government now concedes what it did not concede before: that in light of Defendant's COPD and Type-2 diabetes, he has shown "extraordinary and compelling reasons" under U.S.S.G. § 1B1.13 cmt. app. n. 1(A)(ii)(I) and thus is eligible for further consideration for compassionate release. (Doc. No. 113 at 2).

Based on this concession, Defendant filed "Defendant's Motion to Reconsider Eligibility for Relief under 18 U.S.C. § 3582(c)(1)(a) and for Indicative Ruling" (Doc. No. 109, "Motion to Reconsider"). Via the Motion to Reconsider, Defendant asked the Court to reconsider its May 7, 2020 Order (Doc. No. 105) denying the Motion for Compassionate Release. Defendant contended that given this concession, and the Court's opinion in *Edwards* resulting from just such a concession, the Court should reconsider its ruling that Defendant has shown not "extraordinary and compelling reasons" under Application Note 1(A)(ii)(I) to U.S.S.G. § 1B1.13. He also asked the Court, in pertinent part, to "reconsider the question of eligibility [and] pursuant to Fed. R.

Crim. P. 37, state its willingness to reverse its previous ruling on eligibility." (Doc. No. 109 at 6).[9] Finally, contemplating that the Court eventually would find Defendant eligible for compassionate release, he asked that the Court "ultimately exercise its discretion in [Defendant's] favor, ordering his immediate release because he faces a serious risk of severe harm at FCI Seagoville." (*Id.*).

On July 15, 2020, while declining to indicate its ultimate stance on the final request, the Court otherwise granted the relief requested in the Motion for Compassionate Release, "stat[ing] its willingness to reverse its decision as to whether Defendant has shown 'extraordinary and compelling reasons' under U.S.S.G. §1B1.13 cmt. n.1(A)(ii)(I) such that Defendant's request for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) can be further considered." (Doc. No. 116 at 13). On July 20, in an Order issued in Defendant's ongoing appeal of the Court's earlier denial of his Motion for Compassionate Release, the Sixth Circuit gave this Court the green light to effectuate its stated intention to reverse itself and then proceed to decide whether to grant the Motion for Compassionate Release. (Doc. No. 118). The parties thereafter each made one or more filings to restate and buttress their respective positions; naturally, Defendant continues to maintain that the Motion for Compassionate Release should be granted, and the Government continues to maintain that it should be denied.

## DISCUSSION

### I. EXTRAORDINARY AND COMPELLING REASONS

The Court begins by doing what it has firmly indicated it would do: reverse its earlier decision as to whether Defendant has shown "extraordinary and compelling reasons" within the meaning of Application Note 1(A)(ii)(I). For the reasons set forth in the Court's Order (Doc. No.

---

[9] In his reply in support of the Motion to Reconsider, Defendant noted that his risk of harm had since increased by virtue of a recent severe outbreak of COVID-19 at FCI Seagoville and his personally contracting COVID-19. (Doc. No. 114 at 1-6).

116) on Defendant's Motion to Reconsider, and with the concurrence of each side, the Court finds that Defendant has shown such extraordinary and compelling reasons.

This means that Defendant meets the requirements to be eligible for compassionate release, provided that he is not a danger to other persons or the community.[10] *See* U.S.S.G. § 1B1.13.

## II. DANGER TO OTHER PERSONS OR THE COMMUNITY

The Court finds that Defendant is not a danger. The Court begins by noting that in this case, Defendant was convicted (by guilty plea) on three of the four counts against him, namely, possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count One); possession of Xanax, a Schedule IV controlled substance, with intent to deliver, in violation of 21 U.S.C. § 841(a)(1) (Count Two); and possession of Oxycontin, a Schedule II controlled substance, with intent to deliver, in violation of 21 U.S.C. § 841(a)(1) (Count Three). Count Four, possession of a firearm in furtherance of a federal drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1), was ultimately dismissed.

As Defendant notes, if Defendant were sentenced today, he would not be classified as a career offender, meaning that his guideline range would not be 151-188 months, as it was when he was sentenced, but rather 46-57 months. In that scenario, it is virtually inconceivable that he would have received a sentence anywhere near long enough to still be in custody (even if he also had been sentenced on Count 4). None of this is to say that his sentence was excessively harsh or otherwise "wrong." It is to say, though, that under today's standards (be they "right" or "wrong"), the crimes for which he was charged (and, much more relevantly, the crimes for which he was convicted) in no way suggest by themselves that he currently poses a danger such that he must remain incarcerated.

---

[10] The Court hereinafter will refer to this concept as simply "a danger," for the sake of brevity.

In addition, Defendant's age suggests, statistically, a relatively low risk of recidivism. And, Defendant's criminal convictions, though numerous, by now all are in the fairly distant past. It is certainly possible that had Defendant not been incarcerated for the last decade or so, that would not be the case, but that is speculative, especially with respect to the last few years.

In addition, Defendant's compromised medical condition, which hardly appears to have gotten better with age, similarly suggests a lower risk of recidivism. And his recent COVID-19 infection, though reportedly not resulting in particularly troubling symptoms, hardly could help in that regard. The Court can, and does, conclude that this episode would tend to cool Defendant's enthusiasm for being out and about committing crimes—especially since, in the Court's view, it is widely understood at present that a person who recovers from COVID-19 could have sustained long-term health damage and also could become infected a second-time with COVID-19.

Asserting that Defendant is a danger, the Government makes a few of fair points. Since the instant offenses of conviction occurred when Defendant was 49, he hardly can claim that his criminality was the result of mere youthful indiscretion. But 60 is not the same as 49; age 60 appears associated—statistically, at least—with a substantially lower risk of recidivism than is age 49. *See, e.g.,* Doc. No. 117 at 1; RECIDIVISM AMONG FEDERAL DRUG TRAFFICKING OFFENDERS (Feb. 2017), https://www.ussc.gov/research/research-reports/recidivism-among-federal-drug-trafficking-offenders (last accessed July 23, 2020).

The Government also correctly notes that Defendant's (non-career offender) criminal history category would be V, which, being high, is unsurprisingly associated with a high risk of recidivism. But the recidivism statistics cited by the Government are for all ages, and thus overstate the statistical likelihood of recidivism for someone age 60, like Defendant.

Finally, the Government correctly notes that Defendant has three disciplinary fractions, which are not especially minor in nature. But Defendant has no disciplinary infractions in the last seven and a half years.

Although the question is fairly close given Defendant's criminal history from decades past, the Court concludes that Defendant is not a danger. It does so based on Defendant's above-discussed current personal circumstances and recent record, in addition to additional danger-related considerations discussed below in connection with his history and characteristics, the need for general and specific deterrence, and the need to protect the public from further crimes of Defendant.

III. SECTION 3353(a) FACTORS

Despite being *eligible* for compassionate release, Defendant nevertheless is *entitled to* compassionate release—*i.e.*, should be released—only if such release is warranted considering the above-listed factors set forth in 18 U.S.C. § 3553(a). The Court will discuss each in turn, aware that some factors overlap to a large extent with other factors, and at times cross-referencing its discussion of one factor, or its discussion above, when discussing another factor.

*The nature and circumstances of the offenses of conviction* counsel cut in favor of release. The instant offenses of conviction are undoubtedly serious, involving a dangerous mix of drugs and guns. Just to identify these offenses is to pronounce their overall seriousness. On the other hand, none of the offenses of conviction is a crime of violence. Most relevantly, as indicated above, under current standards (in particular, current provisions of the U.S. Sentencing Guidelines), there is virtually no chance any court would deem the offenses serious enough to justify a sentence as long as the period Defendant already has served.

*The history and characteristics of Defendant* cut slightly in favor of release. As discussed above, Defendant's more dated criminal and disciplinary history cuts against release. However, his recent lack of violations, ageing, recent COVID-19 infection, and current medical condition cuts substantially in favor of release. And his completion of various programs and classes, and his work in various departments, while in BOP custody speaks well of his progress.

In addition, although Defendant has had probation revoked multiple times, it does not appear that he has had it revoked since 1995. Finally, the fact that Defendant accepted responsibility for his instant crimes hardly hurts his position.

*The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, [and] to provide just punishment for the offense* counsels in favor of compassionate release. Defendant has already served more than ten years, a period long enough to meet the specified needs. Indeed, if the current (advisory, of course) United States Sentencing Guidelines are any indication, the period is far greater than necessary to meet these needs.

*The need to afford adequate deterrence to criminal conduct* cuts in favor of compassionate release. The discussion in the preceding paragraph is equally applicable here. And the Court can add that there is nothing to suggest that there is something particular about Defendant—something of which, for example, the United States Sentencing Guidelines would not take account—indicating that he needs a longer sentence to be specifically deterred.

*The need to protect the public from further crimes of Defendant* cuts in favor of compassionate release. As discussed above, the Court concludes that defendant is currently not a danger. This suggests that further incarceration is not necessary to protect the public. So does the

fact that, upon release, he will be on a three-year term of supervised release, which, though not a panacea, will provide opportunities to monitor his behavior and correct it as necessary.[11]

The risk to the public also can be diminished by a responsible release plan. Defendant has presented a plan of living at home with his wife and grandson; the plan appears reasonable because the Court has no derogatory information regarding Defendant's wife and because the proposed living arrangement suggests the possibility of domestic stability, a factor that tends to reduce recidivism generally.

*The need to provide Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner* cuts in favor of compassionate release. The focus in this case plainly is on Defendant's medical needs. Typically, in original sentencings, the "need to provide the defendant . . . with needed medical care" relates to the Court's recommendations to BOP as to what medical treatment should be considered and where the sentence should be served. In the instant context, though, it is fairly construed to refer more generally to the need to assess whether Defendant's medical needs—here, most relevantly, the need to avoid COVID-19—can be handled in a BOP facility. Defendant claims that the answer is no, pointing to the severity of the outbreak at the particular facility where he is incarcerated—which, in addition to explaining his prior COVID-19 infection, substantially increases the likelihood that he will become infected again. He claims this renders him especially vulnerable to bad outcomes should he become infected.

---

[11] As for the need to protect the public from something different—the possibility of contracting COVID-19 from Defendant—that can reasonably be accounted for by requiring that Defendant either: (a) complete a period of 14 days of quarantine immediately prior to release from BOP custody, should BOP in its discretion chose to impose this quarantine; or (b) self-quarantine for 14 days upon arrival at his residence. The Court bases this requirement on what it perceives to be one of the near-universally accepted truths about COVID-19, *i.e.*, that its maximum incubation period is right at 14 days.

The Court will not pretend like it knows precisely the extent to which Defendant's chances of re-infection would be lower if he is released than if he stays in BOP custody, or how much more likely a bad outcome upon infection would be for him as opposed to someone without his particular medical profile. As a matter of sheer epistemology, the undersigned cannot and does not know such things. This is true despite publicly available information from medical experts and public health officials, inasmuch as they do not always agree with one another on issues related to COVID-19 and inasmuch as some of them seem to have changed positions on numerous issues over time.[12] In short, information and opinions regarding the prevalence of, effect of, and optimal countermeasures to COVID-19 have been and remain in constant flux, and it would be folly for the Court to rely on any particular opinion or factual assertion merely because it comes from a purportedly knowledgeable or reputable source.

Having said that, the Court is willing to accept that Defendant is at a higher risk of infection in BOP custody than he would be if released, given the undisputed existence of a major COVID-19 outbreak at FCI Seagoville that already has claimed Defendant. The Court is also willing to accept that Defendant's significant medical issues and prior COVID-19 infection make him especially prone to bad outcomes in case of infection.

Next, given Defendant's apparent lack of an established parole or probation violation since 1995,[13] the record tends to suggest that Defendant has some ability to comply with rules and

---

[12] It seems clear to the undersigned that certain public health authorities, public health officials, and other public officials over time have equivocated regarding, or even starkly reversed, their views concerning one or more of numerous issues, including but not limited to: whether COVID-19 can be transmitted person to person; whether persons should avoid crowds and/or otherwise alter their daily regimen due to the presence of COVID-19 in the United States; the likely death toll and mortality rate from COVID-19; whether masks/face coverings should be worn; the extent to which a person becomes immune after being infected by COVID-19; and the extent to which COVID-19 may be transmitted via contact with inanimate surfaces.

[13] The record reflects that a probation violation warrant was issued for Defendant in 2002 but not that the alleged violation was sustained or acted upon.

societal norms despite his criminal history; this is vital because implicitly under his own theory (and the widely-accepted view worldwide), decreasing his risk of infection upon release from BOP custody would require him to observe public health and societal norms related to COVID-19, such as handwashing, mask-wearing and social distancing.

*The guideline range under the United States Sentencing Guidelines* militates strongly in favor of release. If one accounts for credit apparently due for good time served, Defendant already has served a sentence within (right at the very bottom of) the guideline range (151-188 months) applicable at his sentencing. And, as discussed above, he has served a sentence years longer than the high end of the guideline range that would be applicable if calculated today.

To the Court's understanding, there are not any *policy statements issued by the United States Sentencing Commission* that are pertinent to this Motion. Pertinent sections of the United States Sentencing Guidelines? Certainly, as discussed at length herein. But pertinent provisions of United States Sentencing Guidelines designated as policy statements? Not that the Court perceives.

*The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct* cuts strongly in favor of compassionate release. In the Court's view, there is no doubt that the amended sentence Defendant now seeks would not result in a disparately low sentence compared to defendants (whether sentenced now or when Defendant was sentenced in this case) convicted of similar conduct with similar criminal history. As noted above, the amended sentence would be within the guideline range as it existed at the time of sentencing, and in this sense is hard to characterize as unwarrantedly low. And, as further noted, the amended sentence would be way above the top of the guideline range as it would be calculated today; in this sense, such a sentence cannot fathomably be unwarrantedly low.

## SUMMARY

The Government concedes that Defendant has met the requirement of showing extraordinary and compelling reasons, and the Court (over the Government's objection) concludes that Defendant does not pose a danger within the meaning of U.S.S.G. §1B1.13. Moreover, as the above discussion suggests, especially given the changes to Defendant's guideline range since he was sentenced, the Section 3553(a) factors strongly support release. The Court therefore will grant the Motion.

The Court is mindful that compassionate release is an extraordinary remedy. *See*, *e.g.*, *United States v. Rizzo*, No. CR 16-20732, 2020 WL 2092648, at *3 (E.D. Mich. May 1, 2020). Compassionate release is not ordered lightly or justified easily. So when it is ordered, it should be very clear why the Court is granting a particular defendant a form of relief that, as is a matter of public record, has been very often denied to others nationwide (for reasons this Court does not dispute). The Court believes that its recounting and analysis of the material facts provide that clarity.

## CONCLUSION

For the foregoing reasons, the Motion for Compassionate Release (Doc. No. 85) is **GRANTED**. Defendant's sentence will be reduced to time served (approximately 129 months), plus up to 14 days in the discretion of BOP to quarantine Defendant prior to release. The terms and conditions of supervised release to which Defendant was originally sentenced will remain in place, with the added condition, as discussed above, that he will be required to self-quarantine upon arrival at his residence if he did not complete a 14-day period of quarantine immediately prior to release from BOP custody.[14]

---

[14] The Court will follow the recommendation of the Probation Office to the effect that no other additional conditions of supervised release be imposed in the event of Defendant's compassionate release.

An Amended Judgment in a Criminal Case will be entered.

IT IS SO ORDERED.

                                           *Eli Richardson*
                                           ELI RICHARDSON
                                           UNITED STATES DISTRICT JUDGE